IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-1458

CORBO, JOEL and DOUNAS-FRAZER, DIMITRI,

        Plaintiffs,

v.

THE REGENTS OF THE UNIVERSITY OF COLORADO,

        Defendant.
_____

**COMPLAINT AND JURY DEMAND**
_____

PLAINTIFFS JOEL CORBO and DIMITRI DOUNAS-FRAZER, by and through their counsel, Ciancio, Ciancio, Brown, P.C., allege and state as follows:

**INTRODUCTION**

1. Plaintiffs Joel Corbo and Dimitri Dounas-Frazer (hereinafter "Dr. Corbo" and "Dr. Dounas-Frazer") are respected researchers in the field of physics education research. Dr. Corbo began working for the University of Colorado Boulder on November 4, 2013, and still currently works for the University. Dr. Dounas-Frazer began working for the University on September 1, 2014, and now currently works as an Assistant Professor at Western Washington University, a role he began in December of 2018. In 2017, Dr. Corbo and Dr. Dounas-Frazer were invited by Dr. Melissa Dancy to serve as Co-Principal Investigators (Co-PIs) on a research grant proposal. They jointly applied for a grant from the National Science Foundation (NSF). The grant was funded (NSF Grant No. 1712436, entitled "What Do Physicists from Majority Groups Know and

Believe About Race and Gender?"), with an official start date of August 1, 2017. Dancy is the Principal Investigator (PI) and Dr. Corbo and Dr. Dounas-Frazer were co-PIs. The project involves interviewing white male physics undergraduates, graduate students, and faculty members on the subjects of racism and sexism. Dr. Dancy and Dr. Dounas-Frazer are both white and Dr. Corbo is biracial (Latino and white).

## PARTIES

2. Plaintiff Dr. Corbo is a male, not actively engaged in military service, a resident and citizen of the County of Philadelphia, State of Pennsylvania.

3. Plaintiff Dr. Dounas-Frazer is a male, not actively engaged in military service, a resident and citizen of the County of Whatcom, State of Washington.

4. Defendant The Regents of the University of Colorado (hereinafter "University") is a state institution of higher education established in 1876 pursuant to Article VIII, Section 5 of the Constitution of Colorado with its principal place of business in Colorado.

5. At all times relevant to this *Complaint*, the University was acting through its agents, subagents, representatives, or its own employees or supervising employees, each of whom was acting within the course and scope of his or her agency or employment, and was an "employer" under Title VII, 42 U.S.C. § 2000e(b), and the Colorado Anti-Discrimination Act, ("CADA"), Colo. Rev. Stat. § 24-34-401(3).

6. At all times relevant to this *Complaint*, the University received federal financial assistance, a primary goal of which is to provide for employment, making it a covered employer under Title VI of the Civil Rights Acts of 1964, 42 U.S.C. § 2000d-3, *et seq*.

## JURISDICTION AND VENUE

7. This is a civil action arising under the laws of the United States and is brought pursuant to Title VII of the Civil Rights Act of 1965 ("Title VII") (42 U.S.C. § 2000e *et seq.*), Title VI of the Civil Rights Acts of 1964 ("Title VI") (42 U.S.C. §§ 2000d – 2000d7), and CADA.

8. Plaintiffs invoke the jurisdiction of the court pursuant to Article III, § 2 of the U.S. Constitution, 28 U.S.C. §§ 1331, 1332, 1343, 1367(a), 2201 and 2202.

9. Each Plaintiff's damages exceed $75,000, exclusive of interest and costs, and no two parties are citizens of the same state.

10. Venue is fair and proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this district.

## ADMINISTRATIVE COMPLIANCE

11. Dr. Corbo meets the prerequisites for filing suit:

    a. On April 8, 2019, Dr. Corbo dual-filed a Charge of Discrimination ("Dr. Corbo Charge") with the Colorado Office of the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD") alleging that he was discriminated by the University after Dr. Dancy made racially inappropriate comments about his and another researcher's race, and, after attempting mediation through the University, was removed from the grant, all in violation of Title VII. A copy of Dr. Corbo's Charge is attached, and incorporated herein by reference, as **Exhibit 1**.

    b. On March 1, 2021, the EEOC issued Dr. Corbo a Notice of Right to Sue ("Notice") in a district court in Colorado. Dr. Corbo's Notice is attached, and incorporated herein by reference, as **Exhibit 2**. This *Complaint* is filed within ninety days thereof.

12. Dr. Dounas-Frazer meets the prerequisites for filing suit:

    a. On March 30, 2019, Dr. Dounas-Frazer dual-filed a Charge with the Colorado Office of the EEOC and the CCRD alleging that he was discriminated by the University when after Dr. Dancy made racially inappropriate comments about another researcher's race and after attempted mediation through the University was removed from the grant, all in violation of Title VII. A copy of Dr. Dounas-Frazer's Charge is attached, and incorporated herein by reference, as **Exhibit 3**.

    b. On April 15, 2021, the EEOC issued Dr. Dounas-Frazer a Notice of Right to Sue in a district court in Colorado. Dr. Dounas-Frazer's Notice is attached, and incorporated herein by reference, as **Exhibit 4**. This *Complaint* is filed within ninety days thereof.

## ALLEGATIONS OF FACT

### General Background

13. The above paragraphs are incorporated into the following allegations and claims for relief.

14. On or about November 4, 2013, Dr. Corbo was hired by the University as a Research Associate on a grant administered by the Center for STEM Learning ("CSL").

15. Dr. Corbo was promoted to a Senior Research Associate in CSL, effective August 1, 2017.

16. Dr. Corbo identifies as Hispanic/Puerto Rican.

17. On or about September 1, 2014, Dr. Dounas-Frazer was hired by the University as a Research Associate for the Physics Department.

18. Dr. Dounas-Frazer was promoted to a Senior Research Associate with joint appointments in the Physics Department and in the Joint Institute for Laboratory Astrophysics ("JILA").

19. Dr. Dounas-Frazer identifies as White.

20. On June 30, 2017, the National Science Foundation ("NSF") awarded the University a grant of $299,209 for a project proposal submitted by Dr. Melissa Dancy and Plaintiffs. The project was entitled "What Do Physicists From Majority Groups Know and Believe about Race and Gender?" (hereinafter "Majority Views grant"). The Majority Views grant is attached, and incorporated herein by reference, as **Exhibit 5**.

21. The grant was to run from August 1, 2017 through July 31, 2020.

22. Upon information and belief, Plaintiffs had no prior work performance issues.

23. Upon information and belief, researchers and professors would not be permitted to be on grant had they had prior performance issues.

24. Prior to the Majority Views grant being awarded, Dr. Dancy and Plaintiffs were close friends and colleagues. They would often get together on a weekly basis to cook dinner and play board games.

**Dr. Dancy's Racially Insensitive Remarks**

25. On Friday, September 8, 2017, Dr. Dancy and Plaintiffs met with members of the Physics Education Research ("PER") group to discuss topics related to the grant, including how to conduct in-person interviews with white male physicists. The research team's plan was that Dr. Corbo and Dr. Dounas-Frazer would conduct the interviews.

26. One of the discussion participants, who is a Black woman, raised the methodological question of whether white interview subjects would give comparable answers to Dr. Corbo and Dr. Dounas-Frazer as interviewers given their different racial background. It was then that Dr. Dancy stated that she saw Dr. Corbo as white, and began asking others in the room what they thought his race was. Dr. Corbo was very uncomfortable with the misidentification of his racial background and the way that Dr. Dancy handled the rest of the discussion.

27. On the next day (Saturday, September 9, 2017), some members of the PER group attended a birthday party at a local Boulder bar for Dr. Gina Quan, a member of the PER group who was not associated with the Majority Views grant. Dr. Corbo attended the event; Dr. Dounas-Frazer did not.

28. During Dr. Quan's birthday party, Dr. Dancy mentioned that she had been asked to officiate at an upcoming wedding of friends who wanted to incorporate elements of

Native American traditions into their ceremony. Following that statement, Dr. Laura Ríos, who was offended by the comment and perceived it as cultural appropriation, commented that "everyone wants to be an Indian princess"; Dr. Dancy expressed displeasure with that comment.

29. As the evening came to an end, Dr. Corbo had left, and Dr. Dancy remained at the bar with other PER members. Dr. Dancy once again brought up Dr. Corbo's race and again asked a member of the group what he perceived as Dr. Corbo's race. Dr. Dancy asserted that she was raised in the South and that she once saw race as binary, meaning one was either white or black, and that "black people in the South are 'really black'".

30. Dr. Dancy even gestured to Dr. Quan (who is an Asian-American woman) and stated she would consider people of color who were not African-American as white. Dr. Ríos, who was part of the discussion, asked the group to end the insensitive conversation.

31. Following these actions of Dr. Dancy, Plaintiffs expressed their concerns to Dr. Dancy in regard to her recent behavior and insensitive comments.

32. Unbeknownst to Plaintiffs at the time, Dr. Dancy began asking her supervisor and colleague, Dr. Noah Finkelstein, to determine a way to remove Dr. Dounas-Frazer from the Majority Views grant.

33. After Plaintiffs expressed their concerns to Dr. Dancy, they experienced a halt in the Majority Views grant and tensions arose between them and Dr. Dancy.

34. By the end of the subsequent week, the working relationship and friendship between Plaintiffs and Dr. Dancy had deteriorated significantly.

35. While Dr. Dancy was willing to apologize for her comments to Dr. Quan, she refused to communicate with Dr. Ríos, a Latina researcher, because she thought she was "too aggressive", playing into a stereotype about Latina woman.

36. In an attempt to salvage their relationship and the Majority Views grant, Plaintiffs attempted to resolve the conflict consistent with the University's grievance policies. These attempts included direct in-person conversations with Dr. Dancy, mediation through the University Ombuds Office, and significant breaks on the Majority View grant.

37. In response to Plaintiffs bringing up their concerns, Dr. Dancy requested that Dr. Dounas-Frazer participate in a mediation process with the University Ombuds Office, in effect framing the situation as an interpersonal conflict between her and Dr. Dounas-Frazer rather than a conflict centering on her racially insensitive comments and the people of color who were present for, or implicated by, those comments (i.e., Dr. Corbo, Dr. Laura Ríos, and Dr. Gina Quan). The mediation lasted from September 14 to October 12, 2017. During this time, the work on the Majority Views grant was put on pause by mutual agreement.

38. During this time, Dr. Dounas-Frazer was also a victim of Dr. Dancy's insensitive comments. Dr. Dounas-Frazer, who is a gay male, was walking to a racial justice event with Dr. Dancy when she questioned whether, since he was gay, he was able to "empathize" with women.

39. Subsequent to the first mediation, Plaintiffs and Dr. Dancy met to discuss the future of the grant, and they agreed to continue to pause work to allow time to reach a resolution. Nevertheless, Dr. Dancy violated this agreement, leading Dr. Corbo to request further mediation with the Ombuds Office.

40. Following the attempted mediation, on November 9, Dr. Dancy sent an email to Plaintiffs stating, "There is not going to be a mediated conversation. We are not going to be working together in the future."

41. After the multiple attempts by Plaintiffs and Dr. Dancy failed, the first of three formal University processes began. First, the parties participated in a departmental-level inquiry (Protected Activity 1); second, there was a preliminary inquiry in the issues of discrimination conducted by the CU Office of Institutional Equity and Compliance ("OIEC") (Protected Activity 2); finally, there was an investigation of unprofessional conduct conducted by the Office of Faculty Affairs ("OFA") (Protected Activity 3).

**Protected Activity 1: Departmental Inquiry**

42. On or about mid-November of 2017, Plaintiffs and Dr. Dancy reached out to the CU Office of Contracts and Grants ("OCG"), to inquire about relevant policies and procedures. The OCG Grant Administration Manager, Ron Matteson, informed Plaintiffs and Dr. Dancy that, in the event they could not come to some understanding on how to proceed, the OCG would request a decision from the directors/chairs of the units housing the grant. Professors Valerie Otero and Noah Finkelstein were the co-directors of CSL, and Professor John Cumalat was the chair of the Physics Department.

43. On November 16, Dr. Dancy asked the co-directors to become involved in the fate of the Majority Views grant. However, as stated above and unbeknownst to Plaintiffs, Dr. Dancy had already initiated conversations with co-director Dr. Finkelstein about removing Dr. Dounas-Frazer from the Majority View grant as early as September 14, which led to some partiality to Dr. Dancy from Dr. Finkelstein.

44. Eventually, Dr. Finkelstein recused himself at the request of Plaintiffs.

45. Professors Otero and Cumalat conducted interviews of all involved and, on January 31, concluded that Dr. Dancy showed little or no remorse for her statements and recommended to the Research and Innovation Office ("RIO") that the Majority Views grant be returned to NSF.

46. Plaintiffs later discovered that Dr. Dancy had contacted Vice Chancellor Terri Fiez, who was the head of the RIO, and Suzanne Soled (Director of Faculty Relations), in January prior to the release of Otero and Cumalat's recommendations.

47. On February 4, Fiez convened a committee to review Professor Otero and Cumalat's report. Suzanne Soled was also present on this committee. Despite the fact that Professors Otero and Cumalat were making recommendations about the fate of Majority Views grant, in accordance with Ron Matteson's recommendation, the committee retroactively framed this inquiry as an investigation into Dr. Dancy's behavior. Therefore, they determined the report to be noncompliant with the University's procedures and recommended that no action be taken on the report until completion of a procedurally compliant investigation of unprofessional conduct.

48. Despite the recommendation to take no action, and prior to the completion of any university-level investigation, on March 4, Fiez unilaterally decided to remove Plaintiffs from the grant.

49. However, she did not have the authority to do so, as University had to provide an explanation to NSF as to why Plaintiffs should be removed so that NSF could remove them.

50. Plaintiffs were left in the dark on the process for making this decision, and indeed, on whether they had actually been removed from the grant in reality. They requested to meet with Fiez to discuss her decision and rationale. These meetings happened separately, and Fiez gave inconsistent accounts of her rationale. Fiez also claimed that she had not previously met with Dr. Dancy, even though she met with and emailed with her multiple times since January.

**Protected Activity 2: OIEC Investigation**

51. Based on Dr. Dancy's racial comments, Suzanne Soled alerted the OIEC. The OIEC contacted multiple parties with information about how to file a report. Plaintiffs and Dr. Ríos filed complaints regarding discrimination against Dr. Dancy.

52. Based on the OIEC preliminary inquiry, the OIEC determined that none of the allegations as described by Plaintiffs and Dr. Ríos against Dr. Dancy were so severe or pervasive as to rise to the level of a violation of University discrimination and harassment policy.

53. As a result, the OIEC conducted an informal resolution with Dr. Dancy and discussed the impact of her comments to the three complainants. On June 18, 2018, the OIEC closed the investigation.

**Protected Activity 3: OFA Investigation**

54. OFA conducted an investigation into unprofessional conduct allegations against Dr. Dancy (filed by Plaintiffs and Dr. Ríos) and against Plaintiffs (filed by Dr. Dancy).

55. John Frazee, retired Director of Faculty Relations, was hired to oversee the OFA investigation.

56. John Frazee completed his final report ("Report") on May 31, 2018.

57. In Frazee's report, he concluded that Dr. Dancy and Plaintiffs behaved unprofessionally. Specifically, it was noted in his report "As a seasoned professional, Dr. Dancy made an error in judgement by choosing to discuss a sensitive topic about perceptions of racial identify." Further noting, "Academically relevant and well-intended as her comments may have been, they failed to be appropriately respectful of human dignity…and were therefore, unprofessional."

58. However, Frazee's findings of unprofessional conduct against Plaintiffs was not in compliance with the University's Professional Rights and Duties of Faculty Members ("PRD"), which defines how professional misconduct investigations are to be conducted by OFA. In particular, Frazee concluded that Plaintiffs had behaved unprofessionally by opposing Fiez's attempts to remove them from the grant without proper investigations, but they were never told about this allegation, as is required by the PRD, and therefore had no opportunity to defend themselves against it.

59. In addition, Soled provided Dr. Dancy with strategic advice about what to include in her allegations. Similarly-situated Plaintiffs were offered no such advice.

60. The report was ultimately submitted to Dr. Finkelstein, who is the direct supervisor for Dr. Dancy and Dr. Corbo, and to Professor Heather Lewandowski, who is the direct supervisor for Dr. Dounas-Frazer. As a result of the Report, all three were verbally reprimanded by their supervisors.

61. During Frazee's investigation, out of all the various professors involved in the conflict he interviewed only Dr. Finkelstein, who previously recused himself from the department inquiry (*See supra* ¶¶ 43-44).

**The University Acted Adversely Against Plaintiffs by Removing them from Majority Views grant Because of Plaintiffs' Protected Activity Or Race, Color, or National Origin**

62. On July 17, 2018, the OCG, by way of Ron Matteson, sent a request to the NSF seeking that the NSF remove Plaintiffs from the Majority View grant. This request implied that Plaintiffs were implicated in the OIEC investigation and listed the procedurally-noncompliant finding of unprofessional conduct against them as a reason to justify their removal. They did not disclose the finding of unprofessional conduct against Dr. Dancy.

63. By removing them from the Majority Views grant, the University reduced Plaintiffs' pay in the sense that it reduced the total amount of money that each could draw upon to sustain their positions. This monetary loss constituted a substantial part of their incomes. Plaintiffs' removal from the grant also resulted in a diminution of prestige for them.

64. The above-described actions against Plaintiffs constituted retaliation or discrimination on the basis of race, color or national in violation of CADA, Title VII, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

65. The above-described actions against Plaintiffs were willful. They were also taken with malice and reckless indifference to Plaintiffs' rights protected by law, warranting an award of exemplary damages.

66. Because of the above-described actions, Plaintiffs have suffered: loss of compensation, as well as future pecuniary losses, present and future emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

67. The above-stated paragraphs are incorporated into the following Claims for Relief, all of which wrongs against Plaintiffs caused them damages as sought in the *Ad Damnum* clause below. In addition, the averments of the following claims are incorporated into each other.

**FIRST CLAIM FOR RELIEF**
**(Violation of Title VII, 42 U.S.C. § 2000e *et seq.*)**

68. By the aforesaid acts of discrimination against Plaintiffs, Defendant breached Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

**SECOND CLAIM FOR RELIEF**
**(Violation of Title VII, 42 U.S.C. § 2000e *et seq.* –**
**(Race Discrimination)**

69. By the aforesaid acts of discrimination against Plaintiffs, Defendant breached Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

### THIRD CLAIM FOR RELIEF
### (Violation of Title VII, 42 U.S.C. § 2000e *et seq.*)
### (National Origin)

70. By the aforesaid acts of discrimination against Plaintiffs, Defendant breached Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

### FOURTH CLAIM FOR RELIEF
### (Violation of Title VII, 42 U.S.C. § 2000e *et seq.*)
### (Retaliation)

71. By the aforesaid acts of discrimination against Plaintiffs, Defendant breached Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

### FIFTH CLAIM FOR RELIEF
### (Title VI of the Civil Rights Acts of 1964, 42 U.S.C. §§ 2000d – 2000d7)

72. By the aforesaid acts of discrimination against Plaintiffs, Defendant violated the anti-discrimination or anti-retaliation provisions of Title VI of the Civil Rights Act of 1964.

### SIXTH CLAIM FOR RELIEF
### (Violation of CADA, Colo. Rev. Stat. § 24-34-402, *et seq.*)

73. By the aforesaid acts of discrimination against Plaintiffs, Defendant violated the anti-discrimination or anti-retaliation provisions of CADA.

### PRAYER AND JURY DEMAND

WHEREFORE, Plaintiffs respectfully moves this court and prays for:

a. a declaratory judgment declaring that Defendant has violated the above-described statutes and committed the above-described wrongs by the aforesaid acts against Plaintiffs;

b. re-instatement of Dr. Dounas-Frazer to a position with Defendant comparable to his former position with restoration of the level of compensation and other amenities of employment that he would be earning were it not for the wrongful and illegal actions described herein, or, in lieu thereof, an award of front pay (including benefits);

c. all compensation, back pay, equal pay, front pay and benefits that Plaintiffs was denied because of Defendant's acts, in a sum to be determined by the court and jury;

d. liquidated and compensatory damages, including for past, present and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, in sums to be determined by the court and jury;

e. exemplary or punitive damages, if appropriate, in sums to be determined by the court and jury;

f. reasonable attorney's fees, disbursements, expert fees, and costs of this action;

g. all legal interest on sums awarded;

h. all issues so triable to be decided by a jury;

i. such other relief as the court may deem appropriate.

Dated this 28th day of May, 2021.

Respectfully submitted,

CIANCIO, CIANCIO, BROWN, P.C.

/S/ Dipak P. Patel

Dipak P. Patel
Michael C. Helland
1660 Lincoln St., Ste. 2000
Denver, CO 80264
(303) 451-0300 telephone
dipakpatel@colo-law.com
michaelhelland@colo-law.com

*ATTORNEYS FOR PLAINTIFFS*

**Plaintiffs' Addresses:**

Dr. Corbo
718 N 4th Street
Philadelphia, PA 19123

Dr. Dounas-Frazer
680 32nd Street, Apt. 307
Bellingham, WA 98225

cc:    EEOC via Public Portal